**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

ONEIDA SAVINGS BANK; MARQUIS COMPANIES I, INC.; PINNACLE HEALTHCARE, INC.; ROHM SERVICES CORPORATION; HEATHWOOD HEALTH CARE CENTER, INC.; and EAGLE HEALTHCARE, INC.

*Plaintiffs,*

*v.*

UNI-TER UNDERWRITING MANAGEMENT CORPORATION; UNI-TER CLAIMS SERVICES CORPORATION; U.S. RE COMPANIES, INC.; SANFORD ELSASS; DONNA DALTON; JONNA MILLER; and RICHARD DAVIES

*Defendants.*

Case No. 5:13-CV-0746 (MAD/ATB)

Oral Argument Requested

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS UNI-TER UNDERWRITING MANAGEMENT CORP., UNI-TER CLAIMS SERVICES CORP., U.S. RE COMPANIES, INC., JONNA MILLER AND RICHARD DAVIES'S MOTION TO DISMISS THE COMPLAINT**

CARLTON FIELDS, P.A.
Brian Rosner (Bar Roll No. 518312)
405 Lexington Avenue, 29th Floor
New York, New York 10174-0002
Telephone: (212) 785-2577
Facsimile: (212) 785-5203
*Attorneys for Defendants Uni-Ter Underwriting Management Corp., Uni-Ter Claims Services Corp., U.S. RE Companies, Inc., Jonna Miller and Richard Davies*

**TABLE OF CONTENTS**


**Page**

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

ARGUMENT ..... 2

I. Plaintiffs Fail to State a Claim Under the Exchange Act ..... 2

A. Plaintiffs do not plead any material false statements or omissions with the particularity required by the PSLRA. ..... 2

1. Plaintiffs are accurately informed about Lewis & Clark's reserves. ..... 2

2. Newly received information from Country Villa requires higher reserves. ..... 3

B. Plaintiffs do not plead with the particularity required by the PSLRA that they reasonably relied on any alleged misrepresentation or omission ..... 6

C. Plaintiffs failed to plead facts supporting the requisite "strong inference" of each Defendant's scienter ..... 8

1. Complaints' allegations on alleged scienter ..... 8

2. Plaintiffs' have failed to sufficiently allege motive ..... 9

II. Plaintiffs are Not Entitled to Punitive Damages. ..... 16

CONCLUSION ..... 16

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*Acito v. IMCERA Grp., Inc.*
47 F.3d 27 (2d Cir. 1995) ........................................ 6, 10

*Ashland Inc. v. Morgan Stanley & Co.*
652 F.3d 333 (2d Cir. 2011) ........................................ 7

*Atlantic Gypsum Co. v. Lloyds Int'l. Corp.*
753 F.Supp. 505 (S.D.N.Y. 1990) ........................................ 12

*Beck v. Mfrs. Hanover Trust Co.*
820 F.2d 46 (2d Cir.1987) ........................................ 13

*Cross v. Toyota Motor Corp.*
No. 3:10-cv-1179, 2011 WL 2222350 (N.D.N.Y. June 7, 2011) ........................................ 16

*Emergent Capital Inv. Mgmt. v. Stonepath Grp.*
343 F.3d 189 (2d Cir. 2003) ........................................ 7

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*
375 F.3d 168 (2d Cir. 2004) ........................................ 14

*Forman v. Lehman Bros.*
No. 74 Civ. 200, 1975 WL 416 (S.D.N.Y. Sept. 23, 1975) ........................................ 16

*Glickman v. Alexander & Alexander Services, Inc.*
No. 93 Civ. 7594, 1996 WL 88570 (S.D.N.Y. Feb. 29, 1996) ........................................ 13

*Harsco Corp. v. Segui*
91 F.3d 337 (2d Cir.1996) ........................................ 7

*Honeyman v. Hoyt (In re Carter–Wallace Secs. Litig.*)
220 F.3d 36 (2d Cir.2000) ........................................ 13

*In re AstraZeneca Secs. Litig.*
559 F.Supp.2d 453 (S.D.N.Y. 2008), *aff'd*, 334 Fed.Appx. 404 (2d. Cir. 2009) ........................................ 8, 9

*In re Gilat Satellite Networks, Ltd.*
No. CV-02-1510, 2005 WL 2277476 (E.D.N.Y. Sept. 19, 2005) ........................................ 12

*In re Marsh & Mclennan Cos. Sec. Litig.*
501 F.Supp.2d 452 (S.D.N.Y.2006) ........................................ 14

*In re PXRE Group, Secs. Litig.*
600 F.Supp.2d 510 (S.D.N.Y. 2009), *aff'd*, 357 Fed.Appx. 393 (2d. Cir. 2009) ..................... 14

*In re Sierra Wireless, Inc. Secs. Litig.*
482 F.Supp.2d 365, (S.D.N.Y. 2007) ........................................................................ 15

*Kalnit v. Eichler*
99 F.Supp.2d 327 (S.D.N.Y. 2000) ……………………………………………………11

*Kalnit v. Eichler*
264 F.3d 131 (2d Cir. 2001) ........................................................................ 9, 10, 11, 13

*New York Univ. v. Continental Ins. Co.*
87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763) ........................................................ 17

*Novak v. Kasaks*
216 F.3d 300 (2d Cir. 2000) ........................................................................ 6, 9, 10

*Ottmann v. Hanger Orthopedic Grp.*
353 F.3d 338 (4th Cir. 2003) ........................................................................ 16

*Ross v. Lloyds Banking Grp.*
No. 11 Civ. 8530, 2012 WL 4891759, at *10 (S.D.N.Y. Oct. 16, 2012) ................................ 10

*Rothman v. Gregor*
220 F.3d 81 (2d. Cir. 2000) ........................................................................ 10

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Co.*
75 F.3d 801 (2d Cir.1996) ........................................................................ 10

*Shields v. Citytrust Bancorp*
25 F.3d 1124 (2d Cir. 1994) ........................................................................ 8

*Steinhardt Group, Inc. v. Citicorp*
272 A.D.2d 255, 708 N.Y.S.2d 91 (1st Dep't 2000) ........................................................ 17

*Teamsters Allied Benefit Funds v. McGraw*
No. 09 Civ. 140, 2010 WL 882883, (S.D.N.Y. Mar 11, 2010) ................................................ 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
127 S.Ct. 2499 (U.S.2007)........................................................................ 8, 16

**Rules**

Rule 12(b)(6), Fed.R.Civ.P. ........................................................................ 1

## INTRODUCTION

Uni-Ter Underwriting Management Corporation ("Uni-Ter"), Uni-Ter Claims Services Corporation ("UCSC"), U.S. RE Companies, Inc. ("U.S. RE"), Jonna Miller and Richard Davies (collectively, "Defendants") submit this reply memorandum of law in further support of Defendants' motion to dismiss plaintiffs' complaint ("Complaint")[1] for failure to state a claim pursuant to Fed.R.Civ.P Rule 12(b)(6).[2]

Plaintiffs are the members of the Board of Directors of Lewis and Clark ("L&C"). Five of the six Board members owned L&C and the sixth, Oneida Savings Bank, was L&C's creditor. Plaintiffs allege that in 2011 and 2012, they were tricked into investing $2,200,000 into the business they owned or to which they had lent money.

The trickery allegedly was committed by Defendants, including Uni-Ter, which had invested money into L&C at the same time that the Plaintiffs had invested: Indeed, Uni-Ter's $500,000 investment ("Uni-Ter Investment") was more than twice that invested by five of the six Plaintiffs. Nonetheless, Plaintiffs assert fraud. Because Plaintiffs' (and Uni-Ter's) investments were in the form of a security (to wit, a debenture), Plaintiffs state their claim as federal securities fraud.[3]

---

1 Civil Docket in Case No. 5:13-CV-0746 (MAD/ATB) ("Dkt.") ECF Nos. 1 and 35.

2 Defendants also join in the reply memorandum in further support of Defendants Sanford Elsass and Donna Dalton's motion to dismiss the Complaint dated December 20, 2013.

3 Plaintiffs also assert five New York State law claims over which this Court is alleged to have supplemental jurisdiction.

# ARGUMENT

## I. Plaintiffs Fail to State a Claim under the Exchange Act

### A. Plaintiffs do not plead any material false statements or omissions with the particularity required by the PSLRA.

#### 1. Plaintiffs are accurately informed about Lewis &Clarks's reserves.[4]

In July 2011, L&C declined to renew the coverage of a California insured, Country Villa, which had caused L&C to experience a multi-million dollar loss.[5] Proposed Amended Complaint ("PAC") ¶ 52.

As a consequence of the loss, Uni-Ter retained Brian Stiefel (an independent claims consultant) to review Uni-Ter's "claims handling process" and reserving methodology. PAC ¶64; September 15, 2012 Praxis Report ("Sept. Praxis Report") at 1.[6] Mr. Stiefel presented his single-spaced 16-page report to Plaintiffs at the September 21, 2011 Board meeting. PAC ¶ 64; Sept. Praxis Report at 2, 8-9. Applying the Uni-Ter methodology to nine representative claims, Mr. Stiefel concluded that, as of the date of his review, the reserves had been set correctly. Sept. Praxis Report at 2, 6-9.

However, Mr. Stiefel alerted the Board to a concern regarding Country Villa. *Id.* at 2, 6, 15. Critical to the reserving process, Mr. Stiefel explained to Plaintiffs, is the ability to rely on an insured's defense counsel to promptly report facts that might warrant a revised estimation of liability. *Id.* at 2, 6-9. Country Villa's defense attorney was notorious for not providing information in a timely manner, and a "good portion" of the claims Mr. Stiefel had reviewed

---

4 The statement of facts is drawn from the Complaint, the proposed Amended Complaint, Dkt. No. 45 ("PAC"), and the documents integral to the pleadings. Defendants will oppose Plaintiffs' cross-motion to file the PAC as futile; however, for purposes of this reply motion, and without waiving Defendants' opposition to the PAC, Defendants will reference allegations set forth therein.

5 The loss had caused L&C, for the first time in its 8-year history, to resort to its reinsurance layer of coverage. PAC ¶ 56.

6 Declaration of Brian Rosner dated September 30, 2013 ¶ 3, Ex.1 ("Rosner Decl.").

were Country Villa claims. *Id.* at 6. Although the present reserves were set correctly, Mr. Stiefel advised Plaintiffs that Country Villa was "problematic," and its pending claims needed "diligent oversight and handling." *Id.* at 2, 15. Mr. Stiefel also suggested to the Board that, at some future date, Praxis be retained to review "a larger statistical sampling of claims files." *Id.* at 2.

After Mr. Stiefel's presentation, Plaintiffs and Uni-Ter agreed to invest an additional $2,220,000 in L&C. PAC ¶ 68; Rosner Decl. ¶ 5, Exs. 2 at 10, and 3(C).

**2. Newly received information from Country Villa requires higher reserves.**

In late October 2012, Messrs. Davies and Elsass informed Plaintiffs Marquis, Rohm, Pinnacle and Heathwood that the full amount they had each agreed to invest could be "delayed" because the full amount might not be necessary to stabilize L&C's finances. PAC ¶¶ 70-72.[7]

On November 7, 2011, Plaintiffs held a telephonic meeting "to discuss" the debentures purchases. The views expressed regarding L&C's finances were similar to those expressed two weeks earlier when Messrs. Davies and Elsass had informed four Plaintiffs that they could delay their full investment due to L&C's improving condition: "Mr. Elsass and Ms. Dalton of Uni-Ter, with Mr. Davies and U.S. Re's acquiescence, reassured the Plaintiffs that the capital infusion" from the debenture purchases "would satisfy L&C's capital needs and that the claims reserves were adequate." PAC ¶ 67.

Consistent with Mr. Stiefel's advice, Uni-Ter diligently monitored new information regarding the Country Villa claims. Based on Uni-Ter's observations, in November Uni-Ter retained Praxis to conduct a complete reserve review. *See* PAC ¶ 77. The second Praxis report (the "Dec. Praxis Report") was completed simultaneously with Ms. Donna Dalton's December

[7] Although advising the four Plaintiffs that their full investment could be delayed, Uni-Ter did not delay or reduce the amount it had agreed to invest: Defendant Uni-Ter purchased $300,000 of L&C debentures on November 4, 2011. Rosner Decl. ¶5, Ex. 3(C).

17, 2011 preparation of a draft financial statement that had not yet incorporated the new information from Praxis. PAC ¶ 79. The Dec. Praxis Report conclusion – that a $5 million increase in claims reserves was necessary – was promptly conveyed to Plaintiffs at a December 20, 2011 emergency telephone conference. *Id*. ¶¶ 80, 99.

The risks of which Mr. Stiefel had alerted Plaintiffs in September had come to pass. Country Villa had provided information in addition to what had been known in September. PAC ¶ 64. A "good portion" of the nine sample claims Mr. Stiefel had reviewed were Country Villa claims, which required a reserve increase of $1,200,000. *Id*.

Plaintiffs' allegation that they had been led to believe that the Sept. Praxis Report was a "full review of the amounts reserved for each claim" and not "just" a "sample size review" is baseless. PAC ¶¶ 75, 82-83. That report advises Plaintiffs of the review of the claims handling methodology and an examination of how that methodology had been applied to nine representative claims. Sept. Praxis Report at 2, 6-9.

In addition, at some point during the September meeting, a Plaintiff asked a general question about whether there were any other "claims developments," and Mr. Elsass and Ms. Miller are alleged to have said "no," and Mr. Davies and Ms. Dalton are alleged to have said nothing. PAC¶ 66. This is a material misrepresentation, Plaintiffs allege, because Defendants knew "before" the meeting that "Praxis was going to be evaluating the amount of L&C's loss reserves because it was likely that the reserves needed to be materially larger." *Id*. at ¶ 78.

It is difficult to comprehend what precisely Plaintiffs allege. Certainly, at the September 2011 Board meeting, Defendants concurred with what Mr. Stiefel had reported about the reserve methodology, the adequacy of the reserves, and the process of reviewing and, where needed, increasing reserves; this was Praxis' area of expertise and the reason why Unit-Ter had hired an

outside consultant. And, of course, if the reserves were correct, then the other financial information being provided on September 21 (and thereafter), and the prognosis regarding L&C's future, were also correct.

What Plaintiffs may be trying to allege – but do not with particularity, as they must – is that Defendants knew that the September Praxis Report was wrong. Whether this would be because Defendants had given inaccurate information to Mr. Stiefel, or because Mr. Stiefel's evaluation of the correct facts was wrong (and Defendants intentionally did not correct Mr. Stiefel's errors), Plaintiffs do not allege. Plaintiffs certainly do not allege that, on September 21 or later, Defendants possessed information contradicting Mr. Stiefel's conclusions but withheld that information from Plaintiffs. Other than the bald implication, no fact is alleged that Defendants knew or believed that the information or conclusions contained in the Sept. Praxis Report were inaccurate.[8]

Insofar as facts are alleged, whether in the complaints or documents integral to the pleadings, Defendants' post-September conduct was consistent with their professed belief that, as Mr. Stiefel had reported, the reserve situation had been stabilized. For example, Uni-Ter invested $300,000 in L&C on November 4, 2011: This was three days before the November 7, 2011 Board meeting at which Defendants repeated their belief – consistent with Uni-Ter's $300,000 investment – that L&C's financial situation had stabilized. PAC ¶ 67.

The Uni-Ter investment, and the November 7 Board meeting, occurred two weeks after Messrs. Davies and Elsass had advised four Plaintiffs to delay making their full investment:

---

[8] It bears noting that Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Plaintiffs' Opp.") speaks in terms of Defendants knowing on September 21, 2011 "that Lewis & Clark would dissolve and was hopelessly undercapitalized." Plaintiffs' Opp. at 22. This heated argumentation is unsupported by any alleged fact.

Delay was possible because L&C's finances had so stabilized that the full amount of Plaintiffs' proposed investment might be unnecessary. PAC ¶¶ 70-72.[9]

Investing $300,000, and advising Plaintiffs to withhold investments, is not the conduct of a party that believed that L&C "was destined to fail" or wanted to trick others to invest. Plaintiffs' Opp. at 1. After the November Board meeting, adverse events did occur. Newer information caused Uni-Ter to again retain Praxis in late November to perform a full audit, which disclosed that what Mr. Stiefel had warned Plaintiffs in the September Praxis Report – unexpected information from Country Villa could push the reserve requirements higher – had come to pass. However, the failure to fully anticipate future events is not a misrepresentation or material omission. *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (citing *Acito v. IMCERA Grp., Inc*., 47 F.3d 27, 53 (2d Cir. 1995)).

**B. Plaintiffs do not plead with the particularity required by the PSLRA that they reasonably relied on any alleged misrepresentation or omission.**

Plaintiffs allege to have been misled about L&C reserves. Had they known the "truth" about the number of claims Mr. Stiefel had reviewed in September, and the "truth" about the inaccuracy of his reserve calculations – a "truth" they did not learn until receiving the Dec. Praxis Report on December 20, 2011 – Plaintiffs allege that they would not have purchased the L&C debentures, and Oneida Savings Bank alleges that it would have attempted to collect the $1,000,000 outstanding on its prior debenture. PAC ¶¶ 83-84.

It is well settled that a "[a] plaintiff's reliance on the defendant's misrepresentation must have been reasonable in order for the claim to proceed." *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 337-338 (2d Cir. 2011) (citing *Harsco Corp. v. Segui,* 91 F.3d 337, 342 (2d

[9] And, in reliance on what had been said, the four Plaintiffs did in fact reduce their investments from the amount previously agreed upon. Instead of investing $290,000 apiece, the four Plaintiffs each invested $220,000. PAC ¶¶ 70-72.

Cir.1996)). Accepting as true all of the facts alleged in the Complaint, the PAC, and the documents integral to the pleadings, Plaintiffs §10(b) claim also fails because they are unable to plead reasonable reliance on an alleged misrepresentation.

Mr. Stiefel appeared before the Plaintiffs in September. In print and orally, he explained how L&C's reserves were calculated, and how the process had been applied to nine representative claims. Sept. Praxis Report, at 2, 6-9. He explained in detail the requirement of reliance on an insured's counsel for accurate, current information and how County Villa – the insured whose reserve problems had created a loss – still posed future dangers because of its notoriously unresponsive counsel. *Ibid*. The risks of the reserve process and calculations were not concealed from Plaintiffs, who are sophisticated and experienced businessmen. *See, e.g., Emergent Capital Inv. Mgmt. v. Stonepath Grp.,* 343 F.3d 189, 195 (2d Cir. 2003) ("In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them.") (citations omitted).

Further, Plaintiffs Marquis, Pinnacle, Rohm and Heathwood each purchased a $70,000 debenture two months after December 20, 2011 - the date that Plaintiffs allegedly realized that they had been defrauded.[10] In making these purchases, they obviously were relying on something other than alleged misrepresentations they already knew to be "false."

Moreover, Plaintiff Eagle executed the five debentures sold in February 2012 (four to Plaintiffs, and one, a $200,000 debenture, sold to Uni-Ter). Rosner Decl. ¶5, Ex. 3. If Plaintiffs' unsubstantiated allegations of fraud are correct, then Eagle is an accomplice.

---

[10] Marquis purchased the debenture on February 14, 2012; Pinnacle on February 16, 2012; Rohm on February 28, 2012; and Heathwood on February 29, 2012 - the same day that Uni-Ter purchased a $200,000 debenture. PAC, ¶ 72; Rosner Decl. ¶ 5, Ex. 3.

**C. Plaintiffs failed to plead facts supporting the requisite "strong inference" of each Defendant's scienter.**

Simply put, Plaintiffs have not alleged against any Defendant facts that give rise to a strong inference of scienter, which may be established either by alleging facts to i) show that Defendants had both the motive and the opportunity to commit fraud, or ii) that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *In re AstraZeneca Secs. Litig.*, 559 F.Supp.2d 453, 467 (S.D.N.Y. 2008), *aff'd*, 334 Fed.Appx. 404 (2d. Cir. 2009) (citing *Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1128 (2d Cir. 1994)). Such inference must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *In re AstraZeneca*, 559 F.Supp.2d at 467-468 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2505 (U.S.2007)).

**1. The Complaints' allegations on alleged scienter**

Plaintiffs' set forth the following allegations in support of Defendants' scienter:

- Uni-Ter received compensation at 12% of Gross Written premium plus Claims Management Fees. Plaintiffs' Opp. at 12 (citing Complaint ¶ 30);

- Uni-Ter's and U.S. RE's alleged motive to mislead Plaintiffs about reserves was to delay Lewis & Clark's insolvency and increase its capital available to pay claims before Lewis & Clark's reinsurance policy was triggered and to expand its market share (Complaint ¶¶ 79, 88, PAC ¶ 56);

- Uni-Ter was in a position to capture additional business and expand its market share, which was made possible by the Plaintiffs' investments. *See* Plaintiffs' Opp. at 13 (citing Complaint ¶ 88); *see also*, Complaint ¶ 81;

- U.S.RE's earned additional commission, lowered its exposure of the reinsurance policy, mitigated claims of self dealing and protected its reputation. *See* Plaintiffs' Opp. at 13 (citing Complaint ¶ 80); and

- Continuation of management fees by Uni-Ter (Complaint ¶ 81).

Plaintiffs' motive allegations – which must be sufficiently particularized – are too generalized to demonstrate Defendants' "concrete and personal benefit" from any alleged fraud.

*See Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) ("plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud") (citation omitted).

**2. Plaintiffs' have failed to sufficiently allege motive.**

A. Individual Defendants

Plaintiffs must allege scienter as to each individual defendant and cannot apply the group pleading document to create a presumption of scienter. *In re AstraZeneca,* 559 F.Supp.2d at 472 (dismissing claims because plaintiffs failed to allege scienter "sufficient to support the individual liability of any individual defendant"); *see also*, *Teamsters Allied Benefit Funds v. McGraw,* No. 09 Civ. 140, 2010 WL 882883, at *11, n.6 (S.D.N.Y. Mar 11, 2010) (recognizing that group pleading doctrine cannot be relied upon to create presumption of scienter) (collecting cases) (citations omitted).

The Complaint is devoid of any *specific* motive or opportunity of Messrs. Elsass or Davies, or Ms. Dalton or Ms. Miller ("Individual Defendants") to commit fraud.

Plaintiffs cannot proceed – as they have attempted to do – on general and insufficient motives "possessed by virtually all corporate insiders," including the desire to maintain a high corporate credit rating, or for the corporation to appear profitable, or for an investment to appear successful. *Novak*, 216 F.3d at 307 (internal quotations and citations omitted); *see also*, *Rothman v. Gregor*, 220 F.3d 81, 93 (2d. Cir. 2000) ("company's desire to maintain high bond or credit rating, and thereby maximize marketability of and minimize interest rate on debt securities, does not qualify as sufficient motive for fraud") (citing *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Co*., 75 F.3d 801, 814 (2d Cir.1996)).

Moreover, in alleging motive, "a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold." *Kalnit,* 264 F.3d at 139; *see*

*also*, *Acito v. IMCERA Grp.*, 47 F.3d 47, 54 (2d Cir.1995) ("[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated" ) (citation omitted).

Here, Plaintiffs allege that the Defendant-entities were motivated to commit fraud in order to delay L&C's bankruptcy to earn additional compensation and management fees (similar allegations rejected by the *San Leandro* and *Acito* courts), to protect their business reputation (similar allegation rejected by the *Rothman* court), and to capture additional business and market share (similar allegation on maintain a high rating rejected by the *Novak* court). None of Plaintiffs' allegations indicate "that defendants benefitted in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307-8. Because "[t]he Complaint's scienter allegations consist solely of generalized averments that draw no distinction between and among defendants," *Ross v. Lloyds Banking Grp., PLC*, No. 11 Civ. 8530, 2012 WL 4891759, at *10 (S.D.N.Y. Oct. 16, 2012), the Complaint's motive allegations are too generalized and conclusory to support scienter. *See, e.g., Kalnit*, 264 F.3d at 142 ("plaintiffs have not pointed to any specific benefit that would inure to the defendants that would not be either generalized to all corporate directors or beneficial to all shareholders, not just the defendant directors specifically").

B. Corporate Defendants

As noted herein, Uni-Ter's and U.S. RE's alleged motives to mislead Plaintiffs to delay L&C's insolvency to allow Uni-Ter to continue to collect "management fees,"[11] expand market share, and protect its reputation do not qualify as sufficient motives for fraud.

These alleged motives are also implausible: Plaintiffs initially failed to plead how much Uni-Ter collected in fees from L&C by delaying insolvency. Even though the PAC alleges that Uni-Ter earned at least $1.5 million (or approximately $125,000 monthly) in 2010 and

---

[11] Plaintiffs' sole conclusory allegation that UCSC was entitled to management fees (Complaint ¶ 29) is insufficient to establish motive and opportunity, as well as conscious disregard, discussed *infra*.

$1 million in management fees in 2011 (or approximately $80,000 monthly), (PAC ¶ 31), nothing is alleged for 2012. Plaintiffs' motive allegations actually belie any inference of scienter: it is not credible that a reputable corporation and its officers would subject themselves to the reputational loss and potential civil liability for fraud for, on the whole, a small sum of money collected over a short period of time while "delaying" insolvency. Both the potential liability and insolvency would not lead to market share expansion or a favorable reputation, rather the opposite.

In any event, the Uni-Ter Investment defeats any inference of scienter.[12] *See Kalnit v. Eichler*, 99 F.Supp.2d 327, 337 (S.D.N.Y 2000), *aff'd,* 264 F.3d 131 (2d Cir. 2001) (recognizing the "fundamental flaw" in plaintiff's scienter argument that the interests of the company and its shareholders were aligned rather than adverse). It is ironical that, in a pleading that baldly asserts that Defendants committed material fraudulent omissions, Plaintiffs neglect to mention the Uni-Ter Investment.

Plaintiffs do reluctantly acknowledge that Uni-Ter did invest $500,000 in L&C at the same time as Plaintiffs did, although the acknowledgment comes in their opposition memorandum not the PAC. Plaintiffs' Opp. at 12. Of course, Plaintiffs view the investment as further evidence of fraud: It shows how defendant Uni-Ter falsely sought to "reassure" Plaintiffs when, in truth, Uni-Ter "knew…that the investments would be lost." *Id.* According to Plaintiffs, Uni-Ter knowingly "invested" the $500,000 into a sinkhole so as to continue to make $80,000 a month in fees, although not even Plaintiffs allege that any fees were paid after 2011. *Id.*

Plaintiffs' reasoning is not plausible: If Plaintiffs' lost their investment then surely Uni-Ter would also lose its investment, and if L&C filed for bankruptcy then Uni-Ter could not

12 Rosner Decl. ¶ 5, Ex. 3.

continue to obtain its management fees.[13] The most plausible explanation is that Uni-Ter, and its parent, U.S. RE, believed in good faith that they had invested funds in a turnaround effort, not that they were defrauding Plaintiffs and themselves. *See Atlantic Gypsum Co. v. Lloyds Int'l. Corp.*, 753 F.Supp. 505, 514 (S.D.N.Y. 1990) (noting that plaintiffs' theory of defendants' alleged scheme to defraud by advancing a substantial sum of money to a venture with the intention of driving it into the ground so that defendants could control the failed venture and then join other creditors in a bankruptcy proceeding "defies logic").[14]

**3. Plaintiffs' failed to allege conscious misbehavior.**

Nor have Plaintiffs alleged facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. Conscious misbehavior has been defined as "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *See Kalnit,* 264 F.3d. at 142 (citing *Honeyman v. Hoyt (In re Carter–Wallace Secs. Litig.*), 220 F.3d 36, 39 (2d Cir.2000)). As here, "where motive is not apparent ... the strength of the circumstantial allegations must be correspondingly greater." *Ibid*. (quoting *Beck v. Mfrs. Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987)).

---

13 Thus, Plaintiffs' statement that "Uni-Ter…would double its money as it watched Plaintiffs lose everything" (Plaintiffs' Opp. at 12) is illogical, as well as bad arithmetic. Throwing away $500,000 to "earn" $1,000,000 in fees leaves one with the original $500,000, not double one's investment.

14 *See also In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510, 2005 WL 2277476, at *19 (E.D.N.Y. Sept. 19, 2005) ("[c]ourts have subsequently described a desire to raise much needed capital as amongst the broadest, most generalized, and most commonplace motives of corporate motivation for any action") (internal quotation marks and citation omitted); *Glickman v. Alexander & Alexander Servs.*, No.93 Civ.7594, 1996 WL 88570, *6 (S.D.N.Y. Feb. 29, 1996) (the motive of "a desire to raise much needed capital" is "of the generalized, commonplace nature that the courts within this circuit have found to provide an insufficient basis for an inference of scienter") (internal quotation marks and citation omitted).

Plaintiffs allege as indicia of fraud that Uni-Ter reversed its reserves policy (Complaint ¶¶ 89-91, Plaintiffs' Opp .at 13-14) and falsified L&C's Offering Memorandum (Complaint ¶¶ 83-87, Plaintiffs' Opp. at 14), and that Defendant Dalton's prepared and distributed a draft financial statement that had not yet incorporated the data from the recently completed Dec. Praxis Report (Complaint ¶¶ 73, Plaintiffs' Opp. at 15).

"To determine whether a plaintiff has 'specifically alleged defendants' knowledge of facts or access to information contradicting their public statements,' *Novak*, 216 F.3d at 308, 'Second Circuit cases uniformly rely on allegations that [1] specific contradictory information was available to the defendants [2] at the same time they made their misleading statements.'" *In re PXRE Group, Secs. Litig*., 600 F.Supp.2d 510, 536 (S.D.N.Y. 2009), *aff'd*, 357 Fed.Appx. 393 (2d. Cir. Dec. 21, 2009) (citing *In re Marsh & Mclennan Cos. Sec. Litig*., 501 F.Supp.2d 452, 484 (S.D.N.Y.2006) (emphasis omitted)).

First, the only allegations against Ms. Miller and Mr. Davies are their comments or silence during the September 21and November 7, 2011 Board meetings (PAC¶¶66-67, 78). For the reasons previously discussed, these were neither misrepresentations nor fraudulent omissions, *see* pp. 4-5, *infra*: Ms. Miller and Mr. Davies believed in the accuracy of what was being said. The Complaint is devoid of any allegations of a heightened degree of recklessness against them.

Plaintiffs' allegation that the Offering Memorandum, issued "after the Plaintiffs executed the November 2011 Debentures," adequately "show[s] that Uni-Ter was acting with *scienter*" (*see* Complaint ¶¶ 82, 87) equally fails to establish scienter: factual allegations post-dating the alleged fraud are insufficient to plead scienter. *See, e.g.*, *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (refusing to consider circumstantial evidence of scienter occurring after the alleged wrong).

Second, irrespective of whether the Offering Memorandum allegedly failed to disclose information on the reserves, Plaintiffs already had knowledge of L&C's potential losses, the Sept. Praxis Report, and any potential reserve issues (Complaint ¶¶57-62), and they, as Board members, certainly had the opportunity to review the Sept. Praxis Report in full, question Praxis on it reports and issues therein, or request additional documents, etc.

Moreover, Plaintiffs do not allege that any Individual Defendant drafted, reviewed or participated in the Offering Memorandum, or identify how the Offering Memorandum relates to or contradicts their prior alleged false statements. *See, e.g., In re Sierra Wireless, Inc. Secs. Litig.,* 482 F.Supp.2d 365, 373 (S.D.N.Y. 2007) (noting that "plaintiffs cannot simply allege that confidential company sales reports contradicted contemporaneous public statements, thereby making them false or misleading. Instead, they must specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them") (internal quotation marks and citation omitted).[15]

Next, Plaintiffs' argument that Defendants had a "long-term plan … to deceive investors with misstated claims reserves" to attract new investments and earn management and commission fees (Plaintiffs Opp. at 14) is not supported by the Complaint, which alleges that a Uni-Ter former employee began raising reserves in 2010 and was terminated because of her "tendency to over-reserve without justification," that claims reserves increased in August 2011, and that Uni-Ter "represented to Praxis that Ms. McCarthy's policies were newly instituted

---

15 Aside from the Offering Memorandum accurately disclosing L&C's financial situation as detailed in the Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint, ECF No. 35 at 12, it is not alleged that any third party received or read the Offering Memorandum. Plaintiffs admit to having read the Offering Memorandum at the time it was issued. Plaintiffs' Opp. at 19-20.

The Offering Memorandum also disclosed Plaintiffs' self-interest in having authorized its issuance: It "is anticipated that the funds raised for this offering will eventually be applied, at least in part" to repaying the debenture holders. Rosner Decl. ¶5, Ex. 2 at 18.

corrective measures in August of 2011." Complaint ¶¶ 51, 89-91. Rather, these allegations show that Uni-Ter increased reserves when it learned of significant losses to L&C (*id.* ¶ 51) and presented the amount of significant increased reserves to the Board (*id.* ¶ 53), that Mr. Elsass and Ms. Dalton sent a memorandum to the Board outlining an action plan (*id.* ¶ 57), Uni-Ter hired Praxis, which prepared a report for the Board (*id.* ¶¶ 61-62), Uni-Ter continued to conduct an internal full-scale claims reserve review (id. ¶ 71), and retained Praxis for a complete claims review (*id.* ¶ 73).[16]

Lastly, Plaintiff's allegations regarding Defendant Dalton's submission of a draft financial statement to the Board in December 2011 does not suggests a "continuing scheme to defraud Plaintiffs" (Plaintiffs Opp. at 15). A discussed earlier, Ms. Dalton's draft had been completed without the benefit of the just completed Dec. Praxis Report, which conclusions – superceding those of the draft – were immediately conveyed the Board. *See* PAC ¶¶79-80, 99. Even were the facts otherwise, the submission of the draft financial statement occurred after the November 2011 Debentures and cannot imply intent for prior statements. *See, e.g, Eternity Global Master Fund, supra.*

Based upon the foregoing, Plaintiffs' inference of fraudulent intent is not "at least as compelling as any opposing inference one could draw from the facts alleged." *See Tellabs, Inc., supra*, and, as such the Complaint must be dismissed.

16 *See, e.g., Ottmann v. Hanger Orthopedic Grp.*, 353 F.3d 338, 348 (4th Cir. 2003) (finding that scienter was lacking because, among others, "while the disclosure of the $8 million in third quarter revenue losses due to the departures may not have been adequate to correct the misstatement of the number of departures, it nonetheless militates against a finding that [defendants] acted with a culpable state of mind").

## II. Plaintiffs are not Entitled to Punitive Damages.

Regarding the first and second claims for relief (federal securities laws claims), "[p]unitive damages are not recoverable under the federal securities laws." *Forman v. Lehman Bros., Inc.*, No. 74 Civ. 200, 1975 WL 416, at *1 (S.D.N.Y. Sept. 23, 1975).

Nor are punitive damages recoverable on the state claims. Plaintiffs allege a single fraud against six sophisticated business entities that comprise the six Board members of one company. However serious, the alleged transaction does not involve the type of egregious public harm that would support an award of punitive damages.[17] This conclusion is not altered by Plaintiffs' references to the Offering Memorandum that was issued *after* Plaintiffs' investments, which was accurate and is not alleged to have been read, or relied on, by any member of the public.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion to dismiss the Complaint, and any further relief the Court deems just and proper.

Dated: December 20, 2013
New York, New York

CARLTON FIELDS, P.A.
By:/s/ *Brian Rosner*
Brian Rosner (Bar Roll No.: 518312)
405 Lexington Avenue, 29th Floor
New York, New York 10174-0002
(212) 785-2577 (phone)
(212) 785-5203 (facsimile)
Email: brosner@carltonfields.com

---

[17] Under New York law, punitive damages are not recoverable unless such damages are "necessary to deter defendant and others like it from engaging in conduct that may be characterized as 'gross' and 'morally reprehensible,' and of 'such wanton dishonesty as to imply a criminal indifference to civil obligations.'" *Cross v. Toyota Motor Corp.*, No. 3:10-cv-1179, 2011 WL 2222350, at *2 (N.D.N.Y. June 7, 2011) (citing *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 316, 639 N.Y.S.2d 283). Plaintiffs must allege an "egregious tort directed at the public at large." *Id.* (citing *Steinhardt Grp., Inc. v. Citicorp*, 272 A.D.2d 255, 257, 708 N.Y.S.2d 91 (1st Dep't 2000)).