**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**ONEIDA SAVINGS BANK;**
**MARQUIS COMPANIES I, INC.;**
**PINNACLE HEALTHCARE, INC.;**
**ROHM SERVICES CORPORATION;**
**HEATHWOOD HEALTH CARE CENTER, INC.;**
**EAGLE HEALTHCARE, INC.,**

**Plaintiffs,**

**vs.**

**5:13-CV-746**
**(MAD/ATB)**

**UNI-TER UNDERWRITING MANAGEMENT**
**CORPORATION; UNI-TER CLAIMS SERVICES**
**CORPORATION; U.S. RE COMPANIES, INC.;**
**SANFORD ELSASS; DONNA DALTON;**
**JONNA MILLER; RICHARD DAVIES,**

**Defendants.**

_____

| | |
|---|---|
| **APPEARANCES:** | **OF COUNSEL:** |
| | |
| **HISCOCK & BARCLAY, LLP** | **DAVID G. BURCH, JR., ESQ.** |
| One Park Place | **GABRIEL M. NUGENT, ESQ.** |
| 300 South State Street | **KAREN S. SOUTHWICK, ESQ.** |
| Syracuse, New York 13202-2078 | |
| Attorneys for Plaintiffs | |
| | |
| **CARLTON FIELDS, P.A.** | **BRIAN ROSNER, ESQ.** |
| 405 Lexington Avenue, 29th Floor | **NATALIE A. NAPIERALA, ESQ.** |
| New York, New York 10174-0002 | **JUSTAN CALEAF BOUNDS, ESQ.** |
| Attorneys for Defendants | **WALTER HOLLOWAY BUSH, ESQ.** |
| Uni-Ter Underwriting Management Corporation, | |
| Uni-Ter Claims Services Corporation, | |
| U.S. RE Companies, Inc., | |
| Jonna Miller, and | |
| Richard Davies | |
| | |
| **MORRISON & FOERSTER, LLP** | **JAMIE A. LEVITT, ESQ.** |
| 250 West 55th Street | **JAMES J. BEHA, II, ESQ.** |
| New York, New York 10019 | |
| Attorneys for Defendants | |
| Sanford Elsass and Donna Dalton | |

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On June 25, 2013, Plaintiffs commenced this action alleging claims under the federal securities laws and state common law arising out of Defendants' alleged false representations, which Plaintiffs claim induced them to make additional investments in a now-defunct insurance company. *See* Dkt. No. 1 ("Complaint"). Presently before the Court are Defendants separate but similar motions to dismiss the Complaint, *see* Dkt. Nos. 33, 35, and Plaintiffs' cross-motion to amend the Complaint, *see* Dkt. No. 44. For the reasons stated below, the motions to dismiss are granted in part and denied in part, and the cross-motion to amend is granted.

## II. BACKGROUND

### A.    Plaintiffs' Allegations[1]

Plaintiffs Oneida Savings Bank ("Oneida"), Marquis Companies I, Inc. ("Marquis"), Pinnacle Healthcare, Inc. ("Pinnacle"), Rohm Services Corporation ("Rohm"), Heathwood Healthcare Center, Inc. ("Heathwood"), and Eagle Healthcare, Inc. ("Eagle") (collectively, "Plaintiffs"), allege that Defendant Uni-Ter Underwriting Management Corporation ("Uni-Ter"), at the direction of its co-Defendant and parent company U.S. Re Companies, Inc. ("U.S. Re"), fraudulently and unlawfully induced Plaintiffs to invest $2,200,000 in convertible debentures in Lewis & Clark LTC Risk Retention Group, Inc. ("Lewis & Clark"). Dkt. No. 44-1, Exh. A ("Proposed Amended Complaint") ¶¶ 1-3.

During the time period at issue here, Defendants Sanford Elsass and Donna Dalton were

---

[1] This background is derived from the allegations in Plaintiffs' proposed amended complaint. These allegations are presumed to be true only for the purposes of this motion, and do not constitute findings of fact by the Court.

the President and Chief Executive Officer, and Chief Operating Officer and Chief Financial Officer, respectively, of Uni-Ter. *Id.* ¶¶ 16-17. Defendant Jonna Miller was the Vice President of Claims at Uni-Ter, and Defendant Richard Davies was the Chief Financial Officer of U.S. Re. *Id.* ¶¶ 18-19.

Lewis & Clark is an insurance company that provides professional liability insurance to nursing homes, assisted living facilities, and other long-term care ("LTC") facilities through a risk retention group structure. Risk retention group entities are similar to captive insurance companies, except for the following differences: risk retention groups include multiple policyholders, rather than a single policyholder; policyholders must be equity owners in risk retention groups; risk retention groups are limited to providing only liability coverage; and risk retention groups retain liability for small claims risk and reinsure against large losses. Under a risk retention group model, a "shell" insurance company is created, which in turn contracts with third-party organizations to provide management services, underwriting services, claims management services, risk management services, and reinsurance. *Id.* ¶¶ 24-27.

In 2004, following a series of discussions between an affiliate of Plaintiff Oneida, Bailey & Haskell Associates, Inc., and Defendant Elsass, Oneida agreed to provide capital for the creation of a LTC risk retention group. Thereafter, Uni-Ter formed an entity known as Henry Hudson Risk Retention Group, Inc., whose market for the sale of general and professional liability insurance to LTC facilities was New York State north of Westchester County. At the beginning of 2004, Uni-Ter also formed Lewis & Clark to sell the same products in the states of Washington, Oregon, and Idaho. In early 2005, Henry Hudson and Lewis & Clark merged their operations under Lewis & Clark. At that time, Oneida provided capital to Lewis & Clark in the amount of $1.75 million in the form of a subordinated debenture ("Onieda Debenture"). Each of

the Plaintiffs appointed an individual to represent them on Lewis & Clark's Board of Directors. *Id.* ¶¶ 36-45.

Lewis & Clark, which has no employees of its own, engaged Uni-Ter pursuant to a management agreement to provide all of the insurance company services necessary to run it, including the placement of reinsurance with third parties. Pursuant to the terms of the management agreement, Uni-Ter was to act as a fiduciary of Lewis & Clark and manage its business. In addition, Uni-Ter and its co-Defendant Uni-Ter Claims Services Corporation ("UCSC") were to receive management fees in the form of commissions, claims handling fees, and a profit sharing bonus. In 2010 and 2011, Uni-Ter earned at least $1.5 million and $1.0 million, respectively, in management fees. The management agreement also obligated Uni-Ter and UCSC to provide complete and accurate information regarding the operations of Lewis & Clark to Plaintiffs. *Id.* ¶¶ 28-32, 46.

Lewis & Clark operated successfully and profitably in each of the four calendar years from 2007-2010. In July 2009, Lewis & Clark, at Uni-Ter's direction, accepted two California-based, multi-site LTC operators as policyholders. This decision was a divergence from the established business model of Lewis & Clark in several respects: it was the first time Lewis & Clark chose to insure a large multi-facility operator; these LTC operators had historical loss records outside Lewis & Clark's typical underwriting range; and one of the contracts contained an unprecedented provision that limited the claims exposure of Lewis & Clark on an aggregate level rather than on a claim-specific level. *Id.* ¶¶ 48-51.

In the first three quarters of calendar year 2011 ending September 30, 2011, Lewis & Clark experienced a net loss of $3.1 million. The principal reason for this loss, along with increases in claims reserves for other insureds, was that the two new California-based insureds

had passed on significant losses to Lewis & Clark in the two policy years from July 2009 to July 2011. Lewis & Clark did not renew coverage for the two new California-based insureds in July 2011. *Id.* ¶¶ 52, 54.

On or about September 1, 2011, Defendants Elsass and Dalton sent a memorandum to the Lewis & Clark Board of Directors to outline the recent events causing financial difficulties and "Uni-ter's proposed action plan." Included in that action plan memorandum was a representation that Uni-Ter would hire "[a] consultant . . . to do a complete analysis of the claims process of [UCSC]" and that "[w]e should have his [sic] report to share with the board at the September 21st meeting.["] Prior to the September 21, 2011 Board of Directors meeting, Defendant Dalton transmitted a package of materials to each member of the Board of Directors, which included a report from the consultant retained by Uni-Ter, Praxis Claims Consulting ("Praxis"), dated September 15, 2011. *Id.* ¶¶ 59, 63.

On or about September 21, 2011, the Lewis & Clark Board of Directors held a meeting in Las Vegas, Nevada. At that meeting, which was attended in person or by phone by each of the Directors representing Plaintiffs, as well as Defendants Elsass, Dalton, Miller, and Davies, Uni-Ter presented the amount of the expected claims and the amount of the significantly increased claims reserves to the Board. Defendant Elsass informed the Board that the revised claims reserves were adequate to cover existing and anticipated claims. At that time, Defendants Elsass and Dalton both represented to the Plaintiffs that the one-time operating loss would not result in a financial disruption of Lewis & Clark and that it retained sufficient capital to support its operations and payment of the Oneida Debenture. A representative of Praxis also presented its September 15, 2011 report and raised no concerns with Lewis & Clark's claims reserves. The Praxis report reviewed the reserve methodology in a sample of nine claim files, and did not find

fault with any of those claims or recommend any addition to the loss reserve for any of those claims.

Also during the September 21, 2011 meeting, Defendant Dalton presented the "GAAP Proforma Financial Statement for Period Ending December 31, 2011" that Uni-Ter had prepared for Lewis & Clark. This financial statement did not raise any question as to Lewis & Clark's ability to continue as a going concern and reflected a healthy capital structure, including only the existing claims reserves. During the September 21, 2011 meeting, the Directors (Plaintiffs' representatives) asked Uni-Ter's representatives, Defendants Elsass and Miller, whether there were any claims developments not previously reported. Ms. Miller replied that there were none, and Mr. Elsass agreed—stating that there were none. Mr. Davies of U.S. Re said nothing. Ms. Dalton also remained silent. Ultimately, Defendant Elsass requested that Plaintiffs make additional investments in Lewis & Clark in order to, *inter alia*, preserve Lewis & Clark's good standing with the Nevada Department of Insurance and an acceptable premium-to-equity ratio. *Id.* ¶¶ 55-58, 60-66.

Subsequently, on November 7, 2011, the Board of Directors held a telephonic meeting to discuss the requested additional investment, and Defendants Elsass and Dalton again reassured the Plaintiffs, with Mr. Davies and U.S. Re's acquiescence, that this capital infusion would satisfy Lewis & Clark's capital needs and that the claims reserves were adequate. With the assurances from Uni-Ter and U.S. Re at the Board of Directors meetings on September 21, 2011, and November 7, 2011, Plaintiffs committed to invest an aggregate of $2,200,000 in Lewis & Clark through additional debentures ("November 2011 Debentures"). *Id.* ¶¶ 67-68.

Despite Defendants Elsass' and Dalton's earlier representation on September 1, 2011 that Praxis had been retained to do a complete claims analysis, the Lewis & Clark Board of Directors

later learned that Uni-Ter and U.S. Re limited the scope of Praxis' initial engagement (which resulted in the September 15, 2011 report) to a review of claims-related processes and of a small sample size of nine specific claims reserves.  In late November 2011, Uni-Ter, at U.S. Re's direction, conducted a full-scale internal review of all claims reserves and subsequently engaged Praxis to also conduct a full-scale review.  The internal review was initiated based on Uni-Ter's and U.S. Re's concerns raised in the September 15, 2011 Praxis report about the adequacy of claims reserves.   Before the September 21, 2011 meeting, U.S. Re, Uni-Ter, Mr. Elsass, Ms. Dalton, Ms. Miller, and Mr. Davies knew that Praxis was going to be evaluating the amount of Lewis & Clark's loss reserves because it was likely that the reserves needed to be materially larger.  They intentionally misrepresented this material claims development information to Plaintiffs' representatives at the September 21, 2011 meeting.  *Id.* ¶¶ 75, 77-78

U.S. Re required Uni-Ter to retain Praxis in December 2011 to complete its full claims review, because U.S. Re had doubts about the adequacy of Lewis & Clark's reserves based on the significantly adverse findings of the internal review.  Neither Uni-Ter nor U.S. Re disclosed these doubts to the Plaintiffs despite U.S. Re's knowledge at the time that Uni-Ter's internal review was very negative.  The December 2011 review found that Uni-Ter had understated the sampled claims in the September 15 report by a net $1,200,000.  At some point following the December review performed by Praxis, Uni-Ter and U.S. Re informed the Lewis & Clark Board of Directors on a conference call that, in fact, an increase of $5 million to the claims reserves was necessary based on the Praxis full-scale review.  This significantly increased the net loss of Lewis & Clark on a full 2011 year basis and further decreased Lewis & Clark's capital to an unacceptable level for operational, regulatory, and rating purposes.  *Id.* ¶¶ 64, 79-81

At the time of their additional investments on November 7, 2011, Plaintiffs were not

aware of the significant reserve concerns raised to Uni-Ter and U.S. Re by Praxis in September 2011, but not expressed to the Lewis & Clark Board of Directors. Further, Plaintiffs were led to believe by Uni-Ter that the September Praxis report represented a complete review of the claims process (not just the sample size review reported upon by Praxis), giving them comfort in Uni-Ter's and U.S. Re's representations at the September 21 Board Meeting that claims reserves were adequate. *Id.* ¶ 82.

Uni-Ter's and U.S. Re's motive for making these misrepresentations and omitting these material facts was to delay Lewis & Clark's insolvency and increase its capital available to pay claims before Lewis & Clark's reinsurance policy was triggered. U.S. Re, as a broker of reinsurance, had brokered Lewis & Clark's reinsurance through policy issuer BeazelyRe. Increasing Lewis & Clark's capital by $2,200,000 lowered the exposure of the reinsurance policy U.S. Re had brokered by a similar amount, mitigated any claims of self-dealing BeazelyRe may have against U.S. Re for self-dealing in a policy U.S. Re knew would be triggered, and protected U.S. Re's reputation in the reinsurance business. The delay of insolvency also allowed Uni-Ter to continue receiving management fees for its services to Lewis & Clark and to expand its market share to new policyholders. *Id.* ¶¶ 85-87.

Immediately after Plaintiffs executed the November 2011 Debentures, Uni-Ter prepared and issued an Offering Memorandum seeking additional equity investments in Lewis & Clark ("November 2011 Offering"). Uni-Ter issued the Offering Memorandum to LTC facilities, home health care business, and others in an attempt to sell securities to additional insured parties. At the time Uni-Ter prepared and issued the Offering Memorandum, it knew that the Offering Memorandum failed to disclose material adverse information, such as the existence of the review by Praxis. The Offering Memorandum concealed the true financial position of Lewis & Clark.

For example, it stated:

> The Company has experienced signification [sic] underwriting losses in 2011 and has increased its capital by $2,220,000 as a result of surplus note contributions and, as a result, had a capital and surplus of approximately $3.7 million as of September 30, 2011 (See "Additional Financing")[.] A summary of the Company's most recent financial statement is attached hereto as Exhibit E.
>
> It is expected that the net proceeds generated from this Offering of the Company's Shares will provide additional funds for the Company to continue operations and to comply with all applicable capitalization requirements under the laws of Nevada.

Uni-Ter had told the Plaintiffs that once the Plaintiffs paid for the November 2011 Debentures, the capital of Lewis & Clark would be sufficient to continue operations. *Id.* ¶¶ 89-93.

Uni-Ter, as a manager of other risk retention groups servicing the same market as Lewis & Clark, was in a position to capture additional business for its other risk retention groups from the new insured parties obtained through the November 2011 Offering, which was made possible only by the November 2011 Debentures. The November 2011 Debentures also delayed the inevitable dissolution of Lewis & Clark long enough for Uni-Ter to expand its market share and gain additional insured parties that it could simply service through the other risk retention groups Uni-Ter controlled after Lewis & Clark dissolved. *Id.* ¶ 95

During a December 20, 2011 telephonic Board of Directors meeting, Uni-Ter and U.S. Re informed Plaintiffs of Praxis' full claims review, its findings, and the adverse financial developments of Lewis & Clark. Citing to the Praxis audit findings, Uni-Ter and U.S. Re informed the Lewis & Clark Board of Directors that Lewis & Clark's reserves were inadequate and that urgent action was required to preserve Lewis & Clark's capital structure. *Id.* ¶¶ 99-100.

None of Uni-Ter's or U.S. Re's subsequent efforts to preserve Lewis & Clark's capital structure succeeded, and it ultimately entered a dissolution proceeding under Nevada law on or

about November 11, 2012. All of Plaintiffs' investments in Lewis & Clark, including November 2011 Debentures, have been lost. *Id.* ¶¶ 103-104.

Based on the foregoing allegations, Plaintiffs have made the following claims for relief: (1) a violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") against Defendants Uni-Ter, Elsass, Dalton, Miller, and Davies; (2) a violation of Section 20(a) of the Exchange Act against Defendant U.S. Re; (3) common law fraud against all Defendants; (4) constructive fraud against all Defendants; (5) negligent misrepresentation against all Defendants; (6) fraudulent inducement against all Defendants; and (7) constructive trust against Defendants Uni-Ter and UCSC. Plaintiffs also claim that they are entitled to punitive damages by virtue of Defendants' willful, fraudulent, malicious, and oppressive conduct. *Id.* ¶¶ 106-159.

**B.      Defendants' Motions to Dismiss**

Defendants Uni-Ter, UCSC, U.S. RE, Miller, and Davies (collectively, the "Uni-Ter Defendants") move to dismiss pursuant the Complaint to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Dkt. No. 35-1. Defendant Miller individually moves to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction. *Id.* The Uni-Ter Defendants first argue that Plaintiffs fail to state a claim under Section 10(b) of the Exchange Act. *Id.* at 11-20. Specifically, they contend that the Complaint does not adequately allege a misstatement or omission made by each of the defendants. They also contend that the Complaint does not plead facts supporting a strong inference of scienter for each relevant defendant. The Uni-Ter Defendants further contend that the Complaint does not allege reasonable reliance on any alleged misrepresentation or omission, and does not adequately plead facts alleging loss causation.

Second, the Uni-Ter Defendants argue that Plaintiffs' "control person" claim pursuant to Section 20(a) of the Exchange Act should be dismissed because that claim is dependent on a

10

Section 10(b) claim, which Plaintiffs have failed to adequately allege.  *Id.* at 20-23.  The Uni-Ter

Defendants further assert that the Section 20(a) claim is subject to dismissal for Plaintiffs' failure

to plead facts supporting a reasonable inference of control by U.S. Re of Uni-Ter.  Moreover, the

Uni-Ter Defendants contend that the Complaint fails to plead with particularity that U.S. Re knew

or should have known that the primary violators (*i.e.*, the Defendants against whom the first claim

for relief is interposed) were engaged in fraudulent conduct.

Third, the Uni-Ter Defendants argue that all of Plaintiffs' remaining state law claims

should be dismissed.  *Id.* at 23-30.  They assert that, assuming the federal claims are dismissed,

the Court should decline to exercise supplemental jurisdiction over the state law claims.  Even if

the Court does not dismiss the federal claims or decides to exercise supplemental jurisdiction, the

Uni-Ter Defendants contend that the state law claims should be dismissed because of Plaintiffs'

failure to allege a material misrepresentation or reasonable reliance thereon.  The Uni-Ter

Defendants also contend that Plaintiffs' common law fraud and fraudulent inducement claims fail

for lack of adequate pleading of scienter, and that the constructive trust claim fails because there

is a valid and enforceable agreement between the parties and for lack of any allegation that

Defendants were unjustly enriched at Plaintiffs' expense.

Fourth, the Uni-Ter Defendants argue that Plaintiffs' claim for punitive damages must be

dismissed because Plaintiffs have not alleged an "egregious tort directed at the public at large."

*Id.* at 30-31 (citation omitted).

Finally, Defendant Miller asserts that all of Plaintiffs' claims against her should be

dismissed for lack of personal jurisdiction.  *Id.* at 31-37.

Defendants Elsass and Dalton also seek dismissal of each of Plaintiffs' claims against

them, raising many of the same issues as the Uni-Ter Defendants.  First, Elsass and Dalton argue

that Plaintiffs' fraud and negligent misrepresentation claims, which are both governed by Fed. R. Civ. P. 9(b)'s particularity requirements, fail to adequately allege the "who, what, where, when" of any alleged misstatements. Dkt. No. 33-1 at 14-18. Specifically, Elsass and Dalton contend that the Complaint does not allege who made any of the alleged misstatements, and instead refers to alleged misstatements made by "Uni-Ter" or the "defendants" generally. Elsass and Dalton also contend that the Complaint does not allege precisely what was actually said, nor does it allege that they knew Miller's statement that there were no claims developments not previously reported was false and that they had a duty to correct that statement. Next, Elsass and Dalton contend that the Complaint fails to allege why and how any of the alleged misstatements were false and misleading.

Second, Elsass and Dalton argue that Plaintiffs' fraud claims fail to allege facts supporting a strong inference of scienter by way of either (a) motive and opportunity or (b) conscious misbehavior or recklessness. *Id.* at 18-24. In particular, Elsass and Dalton assert that the Complaint does not identify any concrete benefits realized by Elsass or Dalton as a result of any false statements or wrongful nondisclosures, nor does the Complaint allege any individualized motive to do so. With respect to recklessness, Elsass and Dalton assert that the Complaint does not sufficiently allege that they had specific contradictory information at the time they made the allegedly false statements. Elsass and Dalton further assert that Uni-Ter's own investment in Lewis & Clark at the time of the allegedly fraudulent misstatements negates any inference of scienter. Elsass and Dalton also assert that the allegations in the Complaint actually give rise to a "non-fraudulent inference." *Id.* at 23. That is, Uni-Ter promptly disclosed all negative information and attempted in good faith to save the business of Lewis & Clark.

Last, Elsass and Dalton argue that Plaintiffs' claim for punitive damages should be

dismissed because Plaintiffs do not allege an "egregious tort directed at the public at large," as required under New York law. *Id.* at 25.

## C.     Plaintiffs' Cross-Motion to Amend

Plaintiffs maintain that Defendants' motions to dismiss should be denied in all respects. In the alternative, Plaintiffs seek leave to file an amended complaint. Dkt. Nos. 44; 45 at 45-46. The Proposed Amended Complaint does not seek to add any new claims or parties. Rather, it adds additional detail regarding certain elements of Plaintiffs' claims. Plaintiffs argue that the motion should be granted because the Federal Rules provide that leave to amend should be "freely given," and because amendment at this stage of the litigation would not require Defendants to expend additional resources, nor would amendment delay resolution of the dispute.

## III. DISCUSSION

## A.     Legal Standards

### 1.      Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471

F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting [*Twombly*, 550 U.S.] at 557, 127 S. Ct. 1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[] complaint must be dismissed[,]" *id.* at 570.

## 2.     Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2)

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the "plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003). However, when the issue is decided "[p]rior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith . . . legally sufficient allegations of jurisdiction, *i.e.*, by making a prima facie showing of jurisdiction." *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998) (citations and internal quotation marks omitted); *see PDK Labs, Inc. v. Friedlander*, 103 F.3d

1105, 1108 (2d Cir. 1997). "In deciding [a] pretrial motion to dismiss for lack of personal jurisdiction, the court has considerable discretion." *Landry v. Price Waterhouse Chartered Accountants*, 715 F. Supp. 98, 100 (S.D.N.Y. 1989).

### 3. Motion to Amend Pursuant to Fed. R. Civ. P. 15(a)

A motion for leave to amend a complaint is governed by Rule 15 of the Federal Rules of Civil Procedure, which states that leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Manson v. Stacescu*, 11 F.3d 1127, 1133 (2d Cir. 1993). Pursuant to Fed. R. Civ. P. 15(a)(2), leave to amend a complaint should be freely given in the absence of any apparent or declared reason to not grant leave to amend, such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of amendment. *See Foman*, 371 U.S. at 182; *S.S. Silberblatt, Inc. v. E. Harlem Pilot Block–Bldg. 1 Hous.*, 608 F.2d 28, 42 (2d Cir. 1979); *Meyer v. First Franklin Loan Servs, Inc.*, No. 08–CV–1332, 2010 WL 277090, *1 (N.D.N.Y. Jan. 19, 2010); *Jones v. McMahon*, No. 98–CV–0374, 2007 WL 2027910, *10 (N.D.N.Y. July 11, 2007). Where, as here, plaintiffs seek to amend their complaint while a motion to dismiss is pending, a court "has a variety of ways in which it may deal with the pending motion to dismiss, from denying the motion as moot to considering the merits of the motion in light of the amended complaint." *Roller Bearing Co. of Am., Inc. v. Am. Software, Inc.*, 570 F. Supp. 2d 376, 384 (D. Conn. 2008) (internal quotation marks and alteration omitted).

"An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Annunziato v. Collecto, Inc.*, 293 F.R.D. 329, 333 (E.D.N.Y. 2013) (citing *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir.

15

2002)). "Therefore a proposed amendment is not futile if it states a claim upon which relief can be granted." *Waltz v. Board of Educ. of Hoosick Falls Cent. School Dist.*, No. 1:12–CV–0507, 2013 WL 4811958, *4 (N.D.N.Y. Sept. 10, 2013) (citations omitted).

As Defendants have had sufficient opportunity to respond to the proposed amended complaint, and Plaintiffs do not seek to add new defendants or claims, the merits of the motion to dismiss will be considered in light of the proposed amended complaint. *See Haag v. MVP Health Care*, 966 F. Supp. 2d 137, 140 (N.D.N.Y. 2012). If the proposed amended complaint cannot survive the motion to dismiss, then Plaintiffs' cross-motion to amend will be denied as futile. *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002).

**B.    Exchange Act Claims**

**1.    Section 10(b)**

As noted, Plaintiffs' principal securities fraud claims are brought pursuant to section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), which makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . or any securities-based swap agreement[,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b) (footnote omitted). Rule 10b–5, promulgated by the Securities and Exchange Commission pursuant to Section 10(b), provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> > (a) To employ any device, scheme, or artifice to defraud,
> >
> > (b) To make any untrue statement of a material fact

16

> or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

To state a claim based on a misrepresentation or omission in violation of Rule 10b–5, plaintiffs must allege that a defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998) (internal quotation marks omitted)), *cert. denied*, 546 U.S. 935 (2005).

The Private Securities Litigation Reform Act ("PSLRA") requires a complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . all facts on which that belief is formed," 15 U.S.C. § 78u–4(b)(1), and further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). Similarly, Rule 9(b) of the Federal Rules of Civil Procedure requires a "securities fraud complaint based on misstatements [to] (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

### a. *Misstatement or omission of material fact*

As noted above, to sufficiently allege material misrepresentations or misstatements as part of a Section 10(b) claim, Plaintiffs must satisfy the heightened pleading standards of both Rule 9(b) and the PSLRA and "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004); *see also* 15 U.S.C. § 78u–4(b)(1, 2) (delineating requirements for PSLRA fraud actions). "[The] materiality requirement is satisfied when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusan*, 131 S.Ct. 1309, 1318 (2011) (internal quotation marks and citation omitted).

Here, Defendants contend that Plaintiffs have failed to allege who made each alleged misstatement and, correspondingly, failed to allege a misstatement or omission on the part of each defendant. Defendants also contend that Plaintiffs' vague allegations regarding each defendant's alleged misstatement does not sufficiently identify what was actually said by each defendant. Nor, according to Defendants, do Plaintiffs allege why any of the alleged misstatements were, in fact, false.

To plead a claim against individual defendants under Section 10(b), a plaintiff must allege that the particular defendant "'made' the material misstatements." *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S.Ct. 2296, 2301 (2011) (quoting 17 C.F.R. § 240.10b–5(b)). Specifically, "'[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud.'" *DeBlasio v. Merrill Lynch & Co., Inc.*, No. Civ. 318, 2009 WL 2242605, *10 (S.D.N.Y. July 27,

2009) (quoting *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)); *see also Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). A plaintiff "may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant named in the complaint is entitled to be [apprised] of the circumstances surrounding the fraudulent conduct with which he individually stands charged." *DeBlasio*, 2009 WL 2242605, at *13 (internal quotation marks omitted); *see also Filler v. Hanvit Bank*, Nos. 01 Civ. 9510, 02 Civ. 8251, 2003 WL 22110773, *3 (S.D.N.Y. Sept. 12, 2003) (holding that the plaintiffs had failed to meet the requirements of Rule 9(b) because they failed to "make allegations with respect to each defendant, but instead refer[red] only generally to the defendants as 'the Banks' or 'the Korean Banks'").

In the present matter, the Court finds that Plaintiffs have alleged in sufficient detail to meet the pleading requirements of Rule 9(b) and the PSLRA that Defendants Uni-Ter, Elsass, Dalton, and Miller each made material misrepresentations. Plaintiffs allege that Mr. Elsass informed the Lewis & Clark Board of Directors at the September 21, 2011 board meeting "that the revised claims reserves were adequate to cover existing and anticipated claims," and that he and Ms. Dalton both represented that "the one-time operating loss would not result in a financial disruption of Lewis [&] Clark and that Lewis & Clark retained sufficient capital to support its operations and payment of the Oneida Debenture." According to Plaintiffs, Ms. Dalton also presented a financial statement for Lewis & Clark at the September 21, 2011 board meeting, which reflected a healthy capital structure and included only the existing claims reserves. Plaintiffs also allege that in response to their question at that meeting whether there were any claims developments not previously reported, Ms. Miller replied that there were none and Mr. Elsass agreed and stated that there were none. Moreover, Plaintiffs allege that at the November 7,

2011 teleconference, Mr. Elsass and Ms. Dalton again "reassured Plaintiffs that the capital infusion from the November 2011 Debentures would satisfy Lewis & Clark's capital needs and that the claims reserves were adequate." These representations were false, Plaintiffs allege, because Mr. Elsass, Ms. Miller, and Ms. Dalton knew "it was likely that the reserves needed to be materially larger. . . [and] intentionally misrepresented this material claims development information to the representatives of the Plaintiffs at the September 21, 2011 meeting." Plaintiffs further allege that Praxis raised significant concerns to Uni-Ter and U.S. Re regarding the claims reserves in September 2011 based upon its initial review, but that those concerns were not reported to Plaintiffs. In addition, Plaintiffs have alleged that Mr. Elsass and Ms. Dalton represented on September 1, 2011, that Praxis had been retained to do a complete claims analysis, which would be reported at the September 21, 2011 board meeting, while that review was limited to a review of claims-related processes and a sample of nine specific claims reserves. Plaintiffs have also alleged that Elsass, Dalton, and Miller made these misstatements in their respective capacities as officers of Uni-Ter. Finally, Plaintiffs allege that they would not have made the investments in the form of the November 2011 Debentures but for Defendants' misrepresentations and omissions.

For the purposes of surviving a motion to dismiss pursuant to Rule 9(b) and 12(b)(6), these allegations sufficiently identify the speaker of each alleged misstatement, where and when the misstatements were made, and the content of the misstatement, including why the statement was false. *See DiVittorio v. Equidyne Extractive Industries*, 822 F.2d 1242, 1247 (2d Cir. 1987) (allegations of fraud should specify "the time, place, speaker, and content of the alleged misrepresentations"). However, Plaintiffs have failed allege specific facts regarding any material misstatements or omissions made by Defendant Davies. Plaintiffs allege that Mr. Davies attended

the September 21, 2011 board meeting, and that he said nothing when Plaintiffs asked if there were any claims developments not previously reported and Elsass and Miller stated that there were none.  Plaintiffs also allege that Mr. Davies acquiesced during the November 7, 2011 teleconference when Elsass and Dalton reassured Plaintiffs that the capital infusion from the November 2011 Debentures would satisfy Lewis & Clark's capital needs and that the claims reserves were adequate.  Thus, Plaintiffs do not allege that Davies made any statements, false or not.

Notwithstanding the absence of any statements attributable to Mr. Davies, Plaintiffs appear to argue that he can be held liable for the statements of others.  At least one of the cases cited by Plaintiffs in their opposition relied upon the "group-pleading doctrine" to "circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of the fraudulent intent."  *In re Bear Stearns Companies, Inc. Sec., Deriv., and ERISA Litig.*, 763 F. Supp. 2d 423, 485 (S.D.N.Y. 2011) (citation omitted).  The group-pleading doctrine is inapplicable here, however, because it does not apply to oral statements.  *Camofi Master LDC v. Riptide Worldwide, Inc.*, No. 10 Civ. 4020, 2011 WL 1197659, *9 (S.D.N.Y. Mar. 25, 2011) (observing that "the [group pleading] doctrine is limited to group-published documents, . . . [i]t does not apply to oral statements"); *Defer LP v. Raymond James Financial, Inc.*, 654 F. Supp. 2d 204, 214 (S.D.N.Y. 2009) (discussing the group pleading doctrine and noting "[t]hat limited exception applies only to . . . group-published information that may be presumed to be the collective work of corporate insiders with direct involvement with the everyday business of the company[, but] does not apply to oral statements").  Moreover, to the extent that Plaintiffs contend that Mr. Davies' silence was a material misleading omission, it is well settled that, in the case of an omission, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5."

*Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). Although some courts in this Circuit have found that high-ranking company officials can be held liable for failing to correct statements made in their presence and known to be false, *see Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 195 (S.D.N.Y. 2010) (citations omitted), such a holding would be in tension with the Supreme Court's decision in *Janus*. In *Janus*, the Supreme Court held that only the person who "makes" the misstatement is ultimately liable for a section 10(b) violation. *Janus*, 131 S.Ct. at 2302. "Since each party is liable only for their own misstatements, *Janus* implies that each party is only liable for their own omissions as well." *Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 572 n.13 (S.D.N.Y. 2012); *see also In re UBS AG Securities Litigation*, No. 07 Civ. 11225, 2012 WL 4471265, \*10 (S.D.N.Y. Sept. 28, 2012). Accordingly, the Uni-Ter Defendants' motion to dismiss Plaintiffs' Section 10(b) claim against Defendant Davies is granted.

### b.    Scienter

"The requisite state of mind in a section 10(b) and Rule 10b–5 action is an intent to deceive, manipulate, or defraud." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (internal quotation marks omitted). Scienter may be established by alleging with particularity: "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Glasser v. The9, Ltd.*, 772 F. Supp. 2d 573, 586 (S.D.N.Y. 2011) (internal quotation omitted). In determining whether a plaintiff has pled "a strong inference of scienter," a reviewing court must evaluate all the facts alleged collectively. *Local No. 38 IBEW Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 458 (S.D.N.Y. 2010) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007)).

In order to raise a strong inference of scienter through the "motive and opportunity"

prong, plaintiffs must allege that a defendant "benefitted in some concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000). Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute "motive" for purposes of this inquiry. *Id.* at 307; *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Rather, the "motive" showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit. *Novak*, 216 F.3d at 308. A defendant corporation or corporate officer is generally assumed to have the opportunity to commit fraud. *In re MF Global Holdings Ltd. Secs. Litig.*, 982 F. Supp. 2d 277, 306 (S.D.N.Y. 2013) (collecting cases).

On the other hand, Plaintiffs who solely rely on allegations of "conscious misbehavior or recklessness," bear a "correspondingly greater" burden. *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 233 (S.D.N.Y. 2010) (internal quotations omitted). Recklessness means "'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Novak*, 216 F.3d at 308 (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)).

The Second Circuit has observed that:

> [a]t least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

*ECA*, 553 F.3d at 199 (internal quotation marks omitted).

The Supreme Court has held that for an inference of the requisite scienter to be "strong" in accordance with § 78u–4(b)(2)(A), it must be "more than merely 'reasonable' or 'permissible'—it must be cogent and . . . at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. That inquiry cannot be conducted in a vacuum, but is "inherently comparative"—*i.e.*, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323–24. Thus, while the inference of scienter "need not be irrefutable . . . or even the most plausible of competing inferences," it must be "strong in light of other explanations." *Id.* at 324 (internal quotation marks omitted).

In the present matter, the Court finds that Plaintiffs have sufficiently alleged scienter with respect to Defendants Uni-Ter, Elsass, Dalton, and Miller. While Plaintiffs have not alleged that the individual defendants, Elsass, Dalton, and Miller, benefitted in some concrete and personal way from the purported fraud, Plaintiffs do allege that they knew facts or had access to information suggesting that their statements were not accurate and failed to check information they had a duty to monitor. As such, Plaintiffs have adequately alleged facts giving rise to a strong inference of scienter as to these defendants under the conscious misbehavior or recklessness prong.

As to Uni-Ter, Plaintiffs have sufficiently alleged scienter through both the motive and opportunity and the conscious misbehavior and recklessness prongs.[2] In *Teamsters Local 445*

---

[2] Defendants encourage the Court to consider certain facts not contained in the pleadings. In particular, Defendants reference declarations submitted in support of their motions to dismiss which purport to establish that Uni-Ter itself invested $500,000 in Lewis & Clark during the time period at issue here. According to Defendants, this investment defeats any inference of scienter. The Court declines to consider this information in resolving the instant motions to dismiss. *See S.E.C. v. Simonson*, No. 96 CIV. 96952000 WL 781084, *1 (S.D.N.Y. June 19, 2000).

*Freight Div. Pension Fund v. Dynex Capital Inc.*, the Second Circuit held:

> When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.  In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant.  But it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant.

531 F.3d 190, 195 (2d Cir. 2008).  Thus, Plaintiffs here have raised a strong inference of Uni-Ter's intent by virtue of their allegations with respect to the Defendants Elsass', Dalton's, and Miller's recklessness.  With respect to the motive and opportunity prong, although the Court has found Plaintiffs' allegations as to the individual defendants to be deficient, this determination does not automatically render Plaintiffs' allegations with respect to the corporate defendant Uni-Ter deficient as well.  "To carry their burden of showing that a corporate defendant acted with scienter, plaintiffs in securities fraud cases need not prove that any one individual employee of a corporate defendant also acted with scienter.  Proof of a corporation's collective knowledge and intent is sufficient."  *In re Worldcom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005).  "While [plaintiffs] may be able to show that individual . . . employees acted with scienter with respect to individual issues, [they are] also entitled to show that [the corporate defendant] as a firm was reckless . . . through the sum of its employees' activities and knowledge."  *Id.* at 499-500.  Plaintiffs here have alleged that Uni-Ter's motive was to delay Lewis & Clark's insolvency and increase the capital available to pay claims before Lewis & Clark's reinsurance policy was triggered.  Plaintiffs also allege that by fraudulently inducing Plaintiffs into the November 2011 Debentures, Uni-Ter was able to delay the dissolution of Lewis & Clark long enough to expand its market share and gain additional insured parties that it could ultimately service through its other risk retention groups.  In addition, Plaintiffs allege that the delay of

Lewis & Clark's insolvency allowed Uni-Ter to continue receiving management fees for its services to Lewis & Clark. Based on the foregoing, the Court finds these allegations of Uni-Ter's motive to be sufficient to withstand Defendants' motions to dismiss.

### c. Reasonable reliance

Defendants next argue that Plaintiffs have failed to plead with particularity that they reasonably relied on any alleged misrepresentation or omission. In support of their argument, Defendants attempt to interject factual information not alleged in the four corners of the pleadings. As noted above, the Court declines to consider such information.

Defendants also assert that Plaintiffs were sophisticated investors who had representatives on the Lewis & Clark Board of Directors who were aware of Lewis & Clark's troubled financial condition and had access to information in that regard. "While defendants are certainly correct that reasonable reliance can depend on the sophistication of the parties, the nature of the transaction and a party's failure to make use of means of verification available to it, the resolution of a dispute concerning such issues is rarely appropriate for a motion to dismiss." *Sawabeh Information Svs. Co. v. Brody*, 832 F. Supp. 2d 280, 304 (S.D.N.Y. 2011); *see also AIG Global Secs. Lending Corp. v. Banc. of Am. Secs.*, No. 01 Civ. 11448, 2005 WL 2385854, *9 n.5 (S.D.N.Y. Sept. 26, 2005) ("[T]he issue of whether an investor reasonably relied on a defendant's misrepresentations is a fact-intensive inquiry that cannot be decided on this motion to dismiss."). Accordingly, the Court finds that Plaintiffs have adequately alleged reasonable reliance.

### d. Loss causation

Defendants argue, in cursory fashion, that Plaintiffs have failed to sufficiently allege loss causation. Defendants' principal argument appears to be that the time lag between Plaintiffs' purchase of the securities in November 2011 and the ultimate loss of that investment when Lewis

Clark dissolved a year later in November 2012 diminishes the plausibility of Plaintiffs' loss causation theory.

When misrepresentations induce a buyer to purchase equity, and the losses suffered are a foreseeable consequence of the misrepresentations, the misrepresentations proximately cause the buyer's injuries. *See Manufacturers Hanover Trust Co. v. Drysdale Securities Corp.*, 801 F.2d 13, 20–22 (2d Cir.1986), *cert. denied*, 479 U.S. 1066 (1987). Here, Plaintiffs have alleged that Defendants fraudulently induced them into purchasing the November 2011 Debentures with knowledge of Lewis & Clark's tenuous financial position, which investments were ultimately lost when Lewis & Clark entered dissolution a year later. For the purposes of a motion to dismiss, Plaintiffs' allegations with respect to loss causation are sufficient. While Defendants contend that there may be certain intervening events other than their alleged misrepresentations which caused Plaintiffs' losses, proof of such intervening events is more appropriately considered on summary judgment. *See Gordon v. Sonar Capital Mgmt. LLC*, No. 11–cv–9665, 2014 WL 3900560, *3 (S.D.N.Y. Aug. 1, 2014). Accordingly, the Court finds that Plaintiffs have adequately alleged loss causation.

### 2. Section 20(a)

To establish a Section 20(a) "control person" claim, a plaintiff must allege: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns*, 493 F.3d at 108. Control is only established when a "defendant exercised actual control over the matters at issue." *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 415 (S.D.N.Y. 2010).

As noted above, Plaintiffs have adequately alleged an underlying violation of the

Exchange Act by the controlled person, Uni-Ter. Plaintiffs have also alleged that Uni-Ter was a wholly-owned subsidiary of U.S. Re, the alleged control person. Further, Plaintiffs have alleged that Uni-Ter made the misrepresentations at issue at U.S. Re's direction, that Mr. Davies on behalf of U.S. Re attended the September 21, 2011 board meeting, that a U.S. Re representative arranged the September 15, 2011 Praxis audit, that U.S. Re required Uni-Ter to retain Praxis in December 2011 for the full claims review, and that U.S. Re had knowledge of the relevant underlying facts which rendered Defendants Uni-Ter's, Elsass', Dalton's, and Miller's statements false. These allegations are sufficient to support a claim for control-person liability as to U.S. Re under Section 20(a).

**C.   State Law Claims**

**1.   Common Law Fraud, Constructive Fraud, Negligent Misrepresentation, and Fraudulent Inducement**

Defendants' arguments in support of dismissal of each of Plaintiffs' state law claims are largely the same as those made in support of dismissal of the claims based on federal securities law. Specifically, Defendants contend that Plaintiffs' failure to adequately allege a material misrepresentation, scienter, and reasonable reliance warrants dismissal of the state law claims, to the extent each of those claims requires proof of such elements.

In light of the Court's determination that Plaintiffs have adequately pled their Section 10(b) claims, and the accompanying elements of misrepresentation, scienter, and reasonable reliance, with respect to Uni-Ter, Elssas, Dalton, and Miller, the Court likewise rejects those arguments as they pertain to the state law claims. *See Stephenson v. PricewaterhouseCoopers*, LLP 768 F. Supp. 2d 562, 571 n.1 (S.D.N.Y. 2011) (noting the similar pleading standards for fraud actions under the federal securities laws pursuant to the PLSRA and common law fraud claims pursuant to Rule 9(b)). Likewise, since the Court has found Plaintiffs' Section 10(b)

allegations insufficient as to Mr. Davies, each of the state law claims against him are dismissed. *See Wang v. Bear Stearns Companies LLC*, --- F. Supp. 2d --- , 2014 WL 1512032, *12 (Apr. 16, 2014) (dismissing the plaintiff's common law fraud claims where the complaint had failed to allege Section 10(b) violations); *Marini v. Adamo*, 995 F. Supp. 2d 155, 197 (E.D.N.Y. 2014) (noting that "[c]ourts have found that the elements necessary to establish a claim under 10(b) are essentially the same as those for common law fraud in New York") (citation omitted).

Plaintiffs did not bring their first claim for relief pursuant to Section 10(b) of the Exchange Act against Defendants U.S. Re or UCSC. As such, the Court has not determined in the context of a Section 10(b) claim whether Plaintiffs' allegations that these particular entities participated in the alleged fraud are sufficiently detailed. Accordingly, the Court must undertake an independent review to determine whether Plaintiffs have adequately alleged each of the elements of the state law claims with respect to U.S. Re and UCSC.

As discussed above, the Court has found that Plaintiffs adequately alleged control person liability as to U.S. Re. Plaintiffs have not, however, sufficiently pled U.S. Re's direct participation in the alleged fraud. In particular, there are no allegations that U.S. Re (or its agents) made a material misstatement or omission (or, for that matter, any facts giving rise to a strong inference that it acted with the required state of mind). The Court found that Plaintiffs have failed to allege a misstatement of omission on the part of Mr. Davies, the only agent alleged to have acted on behalf of U.S. Re., and dismissed the Section 10(b) claim against him. With respect to UCSC, Plaintiffs have made no allegations that would indicated it played any role in the events at issue. In fact, the only substantive allegations regarding UCSC are that it was to receive management fees and provide financial information regarding Lewis & Clark pursuant to

the management agreement. Since Plaintiffs' common law fraud,[3] constructive fraud,[4] negligent misrepresentation,[5] and fraudulent inducement[6] claims each require that Plaintiffs allege a misstatement, these claims must be dismissed as to U.S. Re and UCSC.

## 2. Constructive Trust

Defendants argue that Plaintiffs' constructive trust claim should be dismissed because such claims are prohibited where the relationship between the parties is governed by an express contract. In this case, Defendants contend, "all of the obligations of the parties were governed either by the terms of the Management Agreement or the terms of the various debentures." *See* Dkt. No. 35-1 at 29. Defendants also assert that Plaintiffs have failed to allege that Defendants were unjustly enriched at Plaintiffs expense. *Id.*

Under New York law, the elements of a constructive trust are: "(1) a confidential or

---

[3] Under New York law, a common law fraud claim has four elements: "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Banque Arabe et Internationale D' Investissement v. MD. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995).

[4] A plaintiff alleging a claim for constructive fraud under New York law must establish the same elements as a claim for fraud, "except that the element of scienter is replaced by a fiduciary or confidential relationship between the parties." *Burrell v. State Farm & Cas. Co.*, 226 F. Supp. 2d 427, 438 (S.D.N.Y. 2002).

[5] The elements of a claim for negligent misrepresentation under New York law are: (1) carelessness in imparting words; (2) upon which others were expected to rely; (3) and upon which they did act or failed to act; (4) to their damage. Most relevant, the action requires that (5) the declarant must express the words directly, with knowledge or notice that they will be acted upon, to one to whom the declarant is bound by some relation or duty of care. *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003) (citation omitted).

[6] Under New York law, the elements of a claim for fraudulent inducement are: (1) defendant knowingly made a misrepresentation of a material fact; (2) with the intent to deceive another party and induce that party to act on it; (3) plaintiff reasonably relied upon the representation; and (4) as a result of such reliance plaintiff suffered damage. *Universal Antiques, Inc. v. Vareika*, 826 F. Supp. 2d 595, 607 (S.D.N.Y. 2011) (citations omitted).

fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment." *In re Ades and Berg Group Investors*, 550 F.3d 240, 245 (2d Cir. 2008) (citing *Sharp v. Kosmalski*, 40 N.Y.2d 119, 121 (1976)). The Second Circuit has noted that "[a]lthough these factors provide important guideposts, the constructive trust doctrine is equitable in nature and should not be rigidly limited." *Counihan v. Allstate Insurance Co.*, 194 F.3d 357, 362 (2d Cir. 1999) (internal quotations and citations omitted). To assert a viable claim for unjust enrichment under New York law, a claimant must allege facts establishing: "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (internal quotations omitted).

"New York courts have clarified that '[a]s an equitable remedy, a constructive trust should not be imposed unless it is demonstrated that a legal remedy is inadequate.'" *In re First Central Financial Corp.,* 377 F.3d at 215 (quoting *Bertoni v. Catucci,* 117 A.D.2d 892, 895, 498 N.Y.S.2d 902, 905 (1986)). Thus, "where a valid agreement controls the rights and obligations of the parties, an adequate remedy at law typically exists," and a constructive trust should not be imposed. *Id.*; *see also Abraham v. Am. Home Mortgage Servicing, Inc.*, 947 F. Supp. 2d 222, 235 (E.D.N.Y. 2013) (noting that "[i]t is well established that the existence of a contract precludes a claim for a constructive trust"). Under New York law, there can also be no cause of action for unjust enrichment when there is a valid contract governing the same subject matter between the parties. *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (1987).

To state a claim for unjust enrichment, "[t]here is no requirement that the aggrieved party be in privity with the party enriched at his or her expense." *See Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215 (2007). An unjust enrichment claim, however, "requires some type of direct

dealing or actual, substantive relationship with a Defendant." *Reading Int'l, Inc. v. Oaktree Capital Mgmt.*, 317 F. Supp. 2d 301, 334 (S.D.N.Y. 2003). Where the connection between the purchaser and the seller of a product is too attenuated, the claim for unjust enrichment must be dismissed. *Sperry*, 8 N.Y.3d at 215 (2007); *see Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511, 519 (2012).

As an initial matter, the Court notes that Plaintiffs have not alleged any conduct whatsoever on the part of UCSC from which the Court could infer that equity and good conscience require restitution. On this basis alone, UCSC is entitled to dismissal of Plaintiffs' unjust enrichment claim. Moreover, Plaintiffs have not alleged that Uni-Ter or UCSC benefitted at Plaintiffs' expense. Rather, Plaintiffs' allege that Uni-Ter and UCSC benefitted in the form of management fees paid by Lewis & Clark, which is far too attenuated a relationship to support a claim for unjust enrichment or constructive trust. These conclusory assertions fail to satisfy Plaintiffs' pleading burden. Accordingly, the Uni-Ter Defendants' motion to dismiss this claim is granted.

**D.    Punitive Damages**

Plaintiffs have appended to their Section 10(b), Section 20(a), common law fraud, and fraudulent inducement claims a demand for punitive damages. As an initial matter, punitive damages are unavailable for claims of securities fraud under Section 10(b). *See Boguslavsky v. Kaplan*, 159 F.3d 715, 721 (2d Cir.1998); *see also Globus v. Law Research Serv., Inc.*, 418 F.2d 1276, 1283 (2d Cir. 1969) ("[p]unitive, or exemplary damages, as they are sometimes called, are not available for violations of § 10(b) of the [Exchange] Act"). In addition, "[b]ecause under § 20(a), controlling persons are liable only jointly and severally with the primary violators for damages caused by the primary violation, *see* 15 U.S.C. § 78t(a), [plaintiffs] can recover no more

from the defendants than the actual damages he suffered." *Boguslavsky*, 159 F.3d at 721.

Accordingly, Plaintiffs' request for punitive damages under their Exchange Act claims is dismissed.

Under New York law, punitive damages are available in a tort action for "gross, wanton, or willful fraud or other morally culpable conduct" to a degree sufficient to justify an award of punitive damages. *See Shanahan v. Vallat*, No. 03 Civ. 3496, 2004 WL 2937805, *11 (S.D.N.Y. Dec. 19, 2004) (citation omitted).[7] Under New York law, punitive damages are not available in "the ordinary fraud and deceit case." *Shanahan*, 2004 WL 2937805, at *11 (citing *Walker v. Sheldon*, 10 N.Y.2d 401, 405 (1961). Punitive damages are ordinarily awarded in limited cases involving "conduct that may be characterized as 'gross' and 'morally reprehensible,' and of '"such wanton dishonesty as to imply a criminal indifference to civil obligations."' *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 382 F. Supp. 2d 411, 421 n.10 (S.D.N.Y. 2003) (quoting *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 315–16 (1995)); *see also Waltree Ltd. v. ING Furman Selz LLC*, 97 F. Supp. 2d 464, 470–471 (S.D.N.Y. 2000) ("Under New York law, punitive damages are available in a tort action where the wrongdoing is intentional or deliberate, has circumstances of aggravation or outrage, has a fraudulent or evil motive, or is in such conscious disregard of the rights of another that it is deemed willful and wanton."). Whether to award punitive damages raises a question of fact. *Waltree*, 97 F. Supp. 2d at 470–471. However, if a plaintiff fails to allege facts necessary to meet the standard for punitive damages, the issue can

---

[7] Punitive damages are also available in which fraud is aimed at the public generally. *Rocanova v. Equitable Life Assurance Soc'y of the United States*, 83 N.Y.2d 603, 613 (1994). However, this line of cases relates to the "pleading elements required to state a claim for punitive damages as an additional and exemplary remedy when the claim arises from a breach of contract." *Waltree Ltd. v. ING Furman Selz LLC*, 97 F. Supp. 2d 464, 471 (S.D.N.Y. 2000) (quoting *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 316 (1995)). Since the allegations here do not arise from breach of contract, it is unnecessary to address this element.

be dealt with on a motion to dismiss. *See Shanahan*, 2004 WL 2937805, at *11.

Although Plaintiffs have sufficiently pleaded a case for fraud, they have not alleged facts that indicate high moral culpability or a gross, wanton, or willful fraud. Although Plaintiffs allege that Defendants' misstatements and omissions induced them to invest an additional two million dollars in Lewis & Clark, which they ultimately lost, Defendants do not appear to have acted with any greater moral culpability than is involved in an ordinary fraud case. Accordingly, Defendants' motion to dismiss Plaintiffs' request for punitive damages under their common law fraud and fraudulent inducement claims is granted.

**E.      Personal Jurisdiction as to Defendant Miller**

Defendant Miller seeks dismissal of all claims against her on the grounds that the Court lacks personal jurisdiction over her. Specifically, Defendant Miller argues that the New York long-arm statute, N.Y. C.P.L.R. § 302, does not provide jurisdiction over her because she does not transact business within the state. She further contends that the exercise of personal jurisdiction over her would violate federal due process requirements. In response, Plaintiffs assert that personal jurisdiction should be analyzed under the relevant provision of the Exchange Act, which allows for worldwide service of process. Plaintiffs allege that Defendant Miller is a United States resident, *see* Complaint ¶ 18, and have filed proof of service of the summons and complaint on her, *see* Dkt. No. 16. Notably, Defendant Miller did not address Plaintiffs' asserted basis for personal jurisdiction under the Exchange Act in her reply brief.

Section 27 of the Exchange Act, specifically 15 U.S.C. § 78aa, governs the exercise of personal jurisdiction in securities cases.[8] *See also* 15 U.S.C. § 77v (providing for worldwide

_____

[8] The section provides, in relevant part:

service of process). Because Section 27 "permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment," "the personal jurisdiction challenge raised by [Miller] must be tested against due process standards." *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990) (citations omitted).[9]

"The due process test for personal jurisdiction has two related components: the 'minimum contacts inquiry' and the 'reasonableness' inquiry. The court must first determine whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction." *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996) (citations omitted). "If such contacts are found, the court may assert personal jurisdiction so long

---

[8](...continued)

> The district courts of the United States . . . shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

15 U.S.C. § 78aa(a).

[9] Although Miller argues that the Court should analyze personal jurisdiction under the provisions of New York's long-arm statute, N.Y. C.P.L.R. §§ 301 and 302, the Court need not discuss the statute's applicability because "Congress meant [Section] 27 to extend personal jurisdiction to the full reach permitted by the due process clause," and the N.Y. C.P.L.R. "could reach no further." *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1339 (2d Cir. 1972), *abrogated on other grounds*, *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010); *cf. Unifund*, 910 F.2d at 1033 ("Since the . . . Exchange Act permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment, the personal jurisdiction challenge raised by [the defendant] must be tested against due process standards." (citations omitted)).

as 'it is reasonable [to do so] under the circumstances of the particular case.'" *SEC v. Softpoint, Inc.*, No. 95 Civ. 2951, 2001 WL 43611, *2 (S.D.N.Y. Jan. 18, 2001) (quoting *Metro. Life Ins. Co.*, 84 F.3d at 567); *see Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (holding that due process requires that each defendant must have "minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice") (citation and internal quotation marks omitted).

### 1.     Minimum Contacts

In judging minimum contacts under the standard set forth in *International Shoe* and its progeny, courts focus on "'the relationship among the defendant, the forum, and the litigation.'" *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). "The leading Supreme Court cases defining the constitutional limits of the initial minimum contacts inquiry arose in state courts or in federal diversity cases." *Softpoint*, 2001 WL 43611, at *3 (collecting cases); *see, e.g.*, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–76 (1985); *World–Wide Volkswagen Co. v. Woodson*, 444 U.S. 286, 293–94. "In those circumstances, there is no question that the pertinent referent is the Fourteenth Amendment and that the minimum contacts in question are those with the forum state." *SEC v. Morton*, No. 10 Civ. 1720, 2011 WL 1344259, *12 (S.D.N.Y. Mar. 31, 2011), *report and recommendation adopted*, No. 10 Civ. 1720, Dkt. No. 102 (S.D.N.Y. Nov. 3, 2011). "When the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process, however, the Fifth Amendment applies, and the Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state." *Id.* (collecting cases). "It has long been the rule in this Circuit that" when a claim under the Exchange Act is involved, "Section 27 of [the

36

Act], which provides for nationwide service of process, confers personal jurisdiction over the defendants served within the United States." *Steinberg & Lyman v. Takacs*, 690 F. Supp. 263, 265–66 (S.D.N.Y. 1988) (internal citation omitted); *see also Kidder, Peabody & Co., Inc. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2d Cir. 1991) ("Section 27 confers personal jurisdiction over a defendant who is served anywhere within the United States.").

Here, Plaintiffs have alleged that Defendant Miller is a resident of the state of Georgia, and have submitted proof that service of process was effected within the United States. As such, the minimum contacts test is satisfied.

"Moreover, under the doctrine of pendent personal jurisdiction, where a federal statute authorizes nationwide service of process, and the federal and state claims 'derive from a common nucleus of operative fact,' the district court may assert personal jurisdiction over the parties to the related state law claims even if personal jurisdiction is not otherwise available." *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)); *see also International Controls Corp. v. Vesco*, 593 F.2d 166, 175 (2d Cir. 1979) (authorizing pendent personal jurisdiction over related state law claims where federal statute invoked is Section 27 Exchange Act) (citing *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972)), *cert. denied*, 442 U.S. 941 (1979). The Court has found that it has personal jurisdiction over her under the Exchange Act, and (as Defendants concede) the state law claims derive from a common nucleus of operative facts with the federal claims. Therefore, the Court may exercise pendent jurisdiction over the state law claims and need not reach the question whether personal jurisdiction over Defendant Miller as to the state law claims is otherwise available.

  **2.**  **Reasonableness**

"Once it has been decided that a defendant purposefully established minimum contacts within the forum . . . , these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice,'" *Burger King*, 471 U.S. at 476, 105 S.Ct. 2174 (quoting *Int'l Shoe*, 326 U.S. at 320, 66 S.Ct. 154)—"that is, whether it is reasonable under the circumstances of the particular case," *Metro. Life Ins.*, 84 F.3d at 568; *see World–Wide Volkswagen*, 444 U.S. at 292 (explaining that the "fair play and substantial justice" standard is often described in terms of whether it would be "fair" or "reasonable" to subject the defendant to litigation in the forum). In determining the reasonableness of exercising jurisdiction in connection with a particular defendant, courts must evaluate:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Metro. Life Ins.*, 84 F.3d at 568 (citing *Asahi Metal Indus. Co., Ltd. v.Super. Ct.*, 480 U.S. 102, 113–14 (1987)).

"While the exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts at the first stage of the inquiry, it may be defeated where the defendant presents 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Id.* (citing *Burger King*, 471 U.S. at 477); *see also Burger King*, 471 U.S. at 478 (explaining that the defendant must demonstrate that the assertion of personal jurisdiction in the forum will "make litigation so gravely difficult and inconvenient that a party unfairly is at a severe disadvantage in comparison to his opponent" (internal quotation marks omitted)); *Asahi*, 480 U.S. at 116 (Brennan, J., concurring) (finding that only in "rare

cases" will inconvenience defeat the reasonableness of jurisdiction). "The reasonableness inquiry is largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process because of the strong federal interests involved." *SEC v. Syndicated Food Servs. Int'l, Inc.*, No. 04 Civ. 1303, 2010 WL 3528406, *3 (E.D.N.Y. Sept. 3, 2010) (internal quotation marks omitted); *accord Softpoint*, 2001 WL 43611, at *5. "To date, while most courts continue to apply the test as a constitutional floor to protect litigants from truly undue burdens, few (and none in this Circuit) have ever declined jurisdiction, on fairness grounds, in such cases." *Syndicated Food Servs. Int'l*, 2010 WL 3528406, at *3 (internal quotation marks omitted).

Like each and every court in this Circuit to have applied the reasonableness standard after determining that a given defendant has the requisite minimum contacts, this Court finds that this is not the rare case where the reasonableness analysis defeats the exercise of personal jurisdiction. The Court finds that the exercise of personal jurisdiction over Defendant Miller is not unreasonable.

Accordingly, because Plaintiffs have established that Defendant Miller has minimum contacts with the United States and that the exercise of personal jurisdiction over her would not be unreasonable, the Court finds that Plaintiffs have met their burden at this stage of establishing a prima facie case of personal jurisdiction over Defendant Miller. Therefore, Defendant Miller's motion to dismiss for lack of personal jurisdiction is denied.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motions to dismiss (Dkt. Nos. 33, 35) are **GRANTED in part**

**and DENIED in part**[10]; and the Court further

    **ORDERS** that Plaintiffs' cross-motion to amend (Dkt. No. 44) is **GRANTED**; and the Court further

    **ORDERS** that each of Plaintiffs' claims as to Defendants Davies and UCSC are **DISMISSED**; and the Court further

    **ORDERS** that Plaintiffs' constructive trust claim is **DISMISSED**; and the Court further

    **ORDERS** that Plaintiffs' request for punitive damages is **DISMISSED**; and the Court further

    **ORDERS** that Plaintiffs shall file and serve their Amended Complaint within fourteen (14) days of this order in accordance with the Local Rules; and the Court further

    **ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.


**IT IS SO ORDERED.**

Dated:  September 18, 2014
        Albany, New York

**Mae A. D'Agostino**
**U.S. District Judge**

---

[10] As a result of this Memorandum-Decision and Order, the remaining claims are the Section 10(b), common law fraud, constructive fraud, negligent misrepresentation, and fraudulent inducement claims against Defendants Uni-Ter, Elsass, Dalton, and Miller, and the Section 20(a) claim against Defendant U.S. Re.